IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| J.B., | Case No.: 3:23-cv-01962-AN |
| Plaintiff, | |
| v. | |
| | OPINION AND ORDER |
| LEVI GRAY, JAYSON LEAK, PAUL KIZER, JOHN WALLACE, JAMIE DENNISON, FELIPE URZUA-PEREZ, STEPHEN MARTIN, THOMAS JOST, ROBERT YONALLY, LISA ARRINGTON, CHAD NAUGLE, NICOLE BROWN, MIKE REESE, and JOHN DOE, | |
| Defendants. | |

On December 27, 2023, plaintiff J.B. filed the present action against defendants Jayson Leak, Paul Kizer, John Wallace, Jamie Dennison, Felipe Urzua-Perez, Stephen Martin, Thomas Jost, Robert Yonally, Lisa Arrington, Chad Naugle, Nicole Brown, Mike Reese (collectively, the "State defendants"), Levi Gray, and John Doe. Plaintiff alleges violations of her Eighth Amendment and First Amendment rights under 42 U.S.C. § 1983. Plaintiff also filed a Motion for Temporary Restraining Order concurrently with the complaint. Oral argument was heard on the motion on January 11, 2024. For the following reasons, plaintiff's motion is DENIED.

## LEGAL STANDARD

Temporary restraining orders are subject to substantially the same factors as preliminary injunctions. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Generally, a plaintiff seeking a preliminary injunction must show: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in favor of the plaintiff; and (4) an injunction is in the public interest. *Id.* at 20.

The Ninth Circuit uses a "serious questions" test which dictates that "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *All. For the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). Thus, under the serious questions test, a preliminary injunction can be granted if there is a likelihood of irreparable injury to the plaintiff, serious questions going to the merits, the balance of hardships tips in favor of the plaintiff, and the injunction is in the public interest. *M.R. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

However, where requested injunctive relief would "order[ ] a responsible party to 'take action,'" it is a mandatory injunction. *Garcia v. Google, Inc.*, 786 F.3d 733, 741 (9th Cir. 2015) (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)). Mandatory injunctions are particularly disfavored because they go "well beyond simply maintaining the status quo." *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994). Thus, a "district court should deny such relief 'unless the facts and law clearly favor the moving party.'" *Id.* (quoting *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979)). Put simply, mandatory injunctions "should not issue in 'doubtful cases.'" *Garcia*, 786 F.3d at 740 (quoting *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011)).

## BACKGROUND

### A.    Factual Background Related to Parties

Plaintiff is presently incarcerated at Coffee Creek Correctional Facility ("CCCF"). Pl.'s Mot. for Temp. Restraining Order ("Pl.'s Mot."), ECF [2], at 7. She is diagnosed with Attention-Deficit Hyperactivity Disorder, Post-Traumatic Stress Disorder ("PTSD"), Borderline Personality Disorder, and Antisocial Personality Disorder. *Id.* Plaintiff experienced severe abuse as a child, including physical and sexual abuse. *Id.* Plaintiff frequently self-injures to cope with her emotional pain from this trauma, and has attempted suicide numerous times, both before and during her incarceration. *Id.*

Plaintiff entered CCCF custody on March 10, 2022. Decl. of David Wilson ("Wilson Decl."), ECF [17], ¶ 23. In January 2023, she was placed in the Intensive Management Unit ("IMU") after

attacking another adult in custody ("AIC").  *Id.* ¶ 30.  While in the IMU, defendant Levi Gray ("Gray"), a sergeant at CCCF at that time, allegedly sexually and physically abused plaintiff from April of 2023 to May of 2023.  *Id.*  Plaintiff alleges that other named defendants were aware of the abuse; however, defendant Robert Yonally ("Yonally") specifically denies this allegation.  Pl.'s Mot. at 7-8; Decl. of Robert Yonally ("Yonally Decl."), ECF [16], ¶ 28.  Plaintiff did not report the abuse out of fear of retaliation.  Pl.'s Mot. 8.  Another AIC reported the abuse on May 23, 2023, and Gray was placed on a leave of absence on May 24, 2023.  *Id.*  Plaintiff is cooperating with law enforcement in a criminal investigation against Gray.  *Id.*

In October 2023, plaintiff was transferred from the IMU to the Behavioral Housing Unit ("BHU"), where she remains presently.  Wilson Decl. ¶ 30.  Defendants Jayson Leak ("Leak") and Yonally work in the Special Housing Units at CCCF, including the BHU and IMU.  Yonally Decl. ¶ 1; Decl. of Jayson Leak ("Leak Decl."), ECF [15], ¶ 1.  BHU placement is reserved for AICs who have "committed violent or disruptive behavior and [are] diagnosed with a serious mental illness."  Wilson Decl. ¶ 14 (citing Oregon Administrative Rule § 291-048-0280).  Both IMU and BHU placement are where "AICs who present serious management concerns are housed following their segregation sanction until they can complete programming designed to reduce the risk of them engaging in behaviors that are a serious management concern."  *Id.* ¶ 11.  However, BHU placement is not intended to be permanent.  *Id.*  Rather, AICs housed in the BHU participate in a program designed to help treat their mental health conditions, and identify and avoid target behaviors underlying their misconduct to move out of the BHU.  *Id.* ¶ 17.  An AIC's behavioral intervention plan is developed with their assigned Behavioral Health Services ("BHS") team, including a Qualified Mental Health Professional ("QMHP") and a psychiatrist.  *Id.* ¶ 17.  All AICs placed in the BHU begin at level two of the program and must progress to level seven to move back to general population.  *Id.* ¶ 16.  AICs are demoted to level one if they "engage in the treatment plan's target behavior, or threaten the safe, secure, and orderly operation of the BHU."  *Id.* ¶ 18.

Plaintiff's BHS team includes two QMHPs and a psychiatrist.  Decl. of Christy Hutson ("Hutson Decl."), ECF [14], ¶ 11.  Plaintiff's target behaviors are refraining from engaging in (1) threats to staff and other AICs (including verbal and physical attempts) and (2) blocking her cell door and window

with a mattress or any other materials that would prevent staff from making visual wellness checks.  Yonally Decl. ¶ 12.

**B.      Factual Allegations Underlying Plaintiff's Motion**

        1.      *General Allegations*

      Plaintiff generally alleges that when she presses her emergency button to speak with BHS, either no one responds, or whoever responds refuses to let her see BHS.  Pl.'s Mot. 10.  Defendants deny this allegation.  *Id.* ¶ 27; Leak Decl. ¶ 15.

      Plaintiff generally alleges that Yonally and Leak "trigger [her] into acting out."  Pl.'s Mot. 8.  Both defendants deny this, alleging that plaintiff is often triggered by "being held to the rules and orders or having to wait for responses to non-emergency requests," Leak Decl. ¶ 15, or by "having to wait for something instead of having it provided immediately on demand," Yonally Decl. ¶ 27.  Leak asserts that he has "no incentive in escalating any situation to the point where [he] ha[s] to put [himself], fellow staff, and AICs into a dangerous use of force incident or cell extraction."  Leak Decl. ¶ 14.

      Plaintiff alleges that she is prohibited from discussing Gray's alleged sexual abuse with BHS, leaving her PTSD essentially untreated.  Pl.'s Mot. 9-10.  However, defendants allege that plaintiff is receiving Dialectical Behavioral Therapy, which emphasizes "mindfulness, emotional regulation, distress tolerance, and interpersonal effectiveness."  Hutson Decl. ¶ 12.  Defendants allege that, for AICs with PTSD, "discussing details about a traumatic event may place them into an even more vulnerable state and set them back in developing the necessary coping skills."  *Id.* ¶ 15.  Thus, defendants allege that BHS is following its recommended course of mental health treatment by discouraging plaintiff from discussing the alleged sexual abuse.  Defs.' Resp. to Pl.'s Mot. ("Defs.' Resp."), ECF [13], at 6-7.  Further, plaintiff has access to the Center for Hope & Safety, a nonprofit organization that serves victims of domestic violence, sexual assault, and human trafficking.  Hutson Decl. ¶ 16.  Defendants allege that plaintiff can obtain therapeutic sessions at the Center; however, plaintiff alleged at oral argument that the Center does not offer this service.  *Id.*

        2.      *Specific Allegations*

Plaintiff alleges that on June 6, 2023, she met with Captain Gonzales, the Prison Rape Elimination Act ("PREA") Compliance Captain at CCCF, where she stated that she did not want to be around Leak, nor did she want him involved in her BHU programming.  Pl.'s Mot. 9.  When Leak entered the room, plaintiff alleges that she told Captain Gonzales that she did not want him in the room.  *Id.*  Leak, however, alleges that Gonzales had asked him to attend the meeting, and that when he arrived, plaintiff stated, "What the fuck is he doing here? I don't fucking want him in here."  Leak Decl. ¶ 17.  Leak wrote plaintiff a Disciplinary Rule Violation ("DRV").[1]  Pl.'s Mot. 9.  The hearings officer subsequently dismissed the charges.  *Id.*  Leak alleges that the charges were dismissed "in the interest of not further escalating plaintiff's behavior."  Leak Decl. ¶ 17.  Plaintiff alleges that the charges were dismissed because "the video did not support Leak's version of events[.]"  Decl. of J.B. ("J.B. Decl."), ECF [3], ¶ 21.

Plaintiff alleges that she was sexually harassed by defendant Paul Kizer ("Kizer") shortly after Gray's alleged abuse ceased.  Pl.'s Mot. 8.  Although she filed a formal grievance, plaintiff alleges that Kizer was placed back in the BHU, where plaintiff regularly sees him.  *Id.*

Plaintiff alleges that on July 6, 2023, she met with defendant Superintendent Nichole Brown ("Brown") and stated that she was not safe in the BHU because the officers had knowingly failed to protect her from Gray, that she was being subjected to retaliation from the officers, and that Kizer had sexually harassed her.  *Id.* at 9.  Plaintiff alleges that Brown stated that she did not have enough staff to remove the officers from the BHU.  *Id.*  Plaintiff then filed a grievance against Brown, stating that the retaliation violated PREA regulations.  *Id.*  Plaintiff alleges that defendant Lisa Arrington ("Arrington") wrongfully denied the grievance.  *Id.*

At some point in November of 2023, another AIC began making loud, obscene comments about Gray and plaintiff that could be heard by the entire BHU and DSU.  Pl.'s Mot. 10.  Though plaintiff's attorneys emailed the Inspector General's office, a DOJ attorney, and the CCCF PREA Compliance

---

[1] DRVs are adjudicated by hearings officers who review evidence such as "video, eyewitness reports, or photographs," as well as "BHS reports, [and] whether an AIC's mental health needs played a role in the alleged conduct."  Wilson Decl. ¶ 26.  Such evidence may "mitigate or in some cases absolve the AIC of the charges."  *Id.*  All disciplinary hearing findings are reviewed by CCCF Superintendent Nichole Brown.  *Id.*

Manager on multiple occasions, plaintiff called one of her attorneys on November 26, 2023, to report that the other AIC was still making comments. *Id.* at 11. On November 27, 2023, that attorney emailed a DOJ attorney threatening to file a temporary restraining order if the AIC was not stopped. Decl. of Lynn Walsh, ECF [7], ¶ 13, Ex. 1, at 6. The AIC was moved out of the BHU later that day. Pl.'s Mot. 11. However, the AIC allegedly still works in plaintiff's housing unit, and allegedly still makes the comments. *Id.*

Plaintiff alleges that near the end of November of 2023 and into December of 2023, CCCF staff began making her meetings with her attorneys more difficult by refusing to allow plaintiff to bring certain items to the meetings. Pl.'s Mot. 12. Defendants allege that, on the contrary, plaintiff has "expanded access" to phone calls with her attorneys at a rate more frequent than AICs with similar BHU levels and misconduct history. Defs.' Resp. 10. Defendants allege that the only restriction on plaintiff's access to the phone is when the phones are occupied by other AICs on the unit. *Id.* Further, defendants allege that, although plaintiff's attorneys have continued access to CCCF, they, like all visitors, are subject to CCCF's reasonable restrictions in recognition of the facility's security requirements. *Id.*

On December 3, 2023, plaintiff allegedly suffered a medical emergency where her limbs went numb, and she was unable to speak. Pl.'s Mot. 12. Plaintiff alleges that officers did not respond to her requests for help until she called one of her attorneys, who called Gonzales. *Id.* After Gonzales called CCCF, plaintiff alleges that approximately forty minutes passed before medical staff responded. *Id.* Plaintiff alleges that she was placed in the infirmary but was "essentially provided with no treatment." *Id.* However, according to defendants, plaintiff first pressed her emergency button at 2:55pm, and medical staff cleared her after checking her vitals and she was returned to her cell. Leak Decl. ¶ 19. The nurse who had checked plaintiff's vitals left to discuss her symptoms with a medical provider. *Id.* ¶ 20. Plaintiff pressed the button again at 3:33 pm, and medical staff arrived at 3:50pm. *Id.* ¶ 21. At that time, plaintiff was escorted to the triage room where medical staff cleared her, and she was returned to her cell at 4:15pm. *Id.* ¶ 22. At 4:26pm, plaintiff allegedly hit her emergency button again, and medical was notified. *Id.* ¶ 23. Plaintiff pressed the button again at 5:00pm and medical staff was notified. *Id.* ¶ 24.

When plaintiff was on the phone with her attorney, defendants allege that there was one nurse speaking with a medical provider to determine next steps while a second nurse continually monitored plaintiff. *Id.* ¶ 25. At medical's recommendation, plaintiff was moved to the trauma room in CCCF's clinic while staff prepared an emergency transport packet and team. *Id.* ¶ 29. However, after consulting with the medical provider and medical manager, at 6:00 pm, health services decided to keep plaintiff in the clinic infirmary overnight for close observation and treatment. *Id.* ¶ 30. Plaintiff was released the following morning and returned to her cell without any apparent symptoms or distress. *Id.* ¶ 31.

On December 19, 2023, plaintiff alleges that she experienced an allergic reaction that caused her throat to begin closing. Pl.'s Mot. 13. She alleges that she requested an EPI Pen or Benadryl but did not receive them. *Id.* She alleges that she began vomiting but received no immediate response from medical. *Id.* When a nurse arrived, plaintiff alleges that the on-call provider refused to authorize any medication. *Id.* On December 20, 2023, plaintiff then placed her mattress against her cell door and refused to take it down until she saw someone from medical. *Id.* CCCF officers eventually entered plaintiff's cell for a forced cell extraction while she was on the phone with one of her attorneys. *Id.* Plaintiff alleges that the officers dragged her through the dayroom while she was clothed only in her underwear and placed her in the shower for several hours. *Id.* at 13-14.

Yonally then issued a deprivation order that remained in place for three days. *Id.* at 14. Plaintiff alleges that she was deprived of a mattress, sheets, pillows, blankets, and adequate warm clothing. *Id.* She alleges that she slept on the concrete floor of her cell for three days with only a "suicide blanket."[2] *Id.* Plaintiff also received a DRV for Staff Assault II and Disobedience of an Order. *Id.* ¶ 20.

Defendants, again, have a different version of events. Defendants allege that the incident began when plaintiff blocked her cell door and window with her mattress on December 20th. Yonally Decl. ¶ 17. Although this type of incident would ordinarily warrant an immediate use of force, staff allegedly first tried multiple de-escalation tactics, including negotiating, calling BHS to talk with plaintiff, allowing

---

[2] A suicide blanket, also described as "smock blanket," is an approximately seven foot by five foot blanket with a pillow sewn into the padding. Yonally Decl. ¶ 23.

plaintiff to talk to her attorney, and giving her additional time to voluntarily comply with orders to remove the mattress. *Id.* Plaintiff allegedly stopped responding to staff questions, and CCCF staff could not "confirm that JB was alive and breathing." *Id.* Staff then attempted to clear the mattress using a cell clearing device, but plaintiff allegedly grabbed the device and would not return it. *Id.* ¶ 18. According to defendants, it was only when these efforts failed that they resorted to a cell extraction. *Id.*

Defendants further allege that, prior to the cell extraction, plaintiff had covered herself and her cell floor with soapy water. *Id.* Upon entry, plaintiff allegedly threw a cup of soapy water into an officer's face. *Id.* Staff allegedly gave plaintiff opportunities and orders to voluntarily submit to restraints, but plaintiff refused. *Id.* Staff allegedly then used "minimal force" to gain control and escorted plaintiff to the shower to wash off the soapy liquid. *Id.* Plaintiff was offered a medical evaluation but refused. *Id.* Plaintiff's QMHP checked in with her, and approximately two hours later, defendants allege that plaintiff "was ready to comply with staff" and returned to her cell without further incident. *Id.*

Defendants do not deny that Yonally issued a deprivation order but allege that only plaintiff's mattress and bedding was removed. *Id.* ¶ 21. According to defendants, plaintiff was still provided with two smock blankets, and she had access to her clothing throughout the order. *Id.*

Plaintiff filed the present lawsuit and Motion for TRO on December 27, 2023. The complaint alleges three claims: (1) violation of the Eighth Amendment for sexual abuse through 42 U.S.C. § 1983, against defendants Gray, Kizer, Yonally, Leak, Brown, Naugle, Doe, Wallace, Dennison, Urzua-Perez, and Martin; (2) violation of the Eighth Amendment for unconstitutional conditions of confinement through 42 U.S.C. § 1983, against defendants Brown and Naugle; and (3) violation of the First Amendment for retaliation through 42 U.S.C. § 1983, against defendants Jost, Yonally, Leak, and Arrington. Plaintiff's Motion for TRO seeks the following injunctive relief under a TRO or preliminary injunction, or, in the alternative, pursuant to the All Writs Act:

1. Requiring ODOC to house plaintiff so that she is no longer in the "triggering environment" (preferably at Oregon State Hospital), and specifically so that she is no longer in the DSU, MHI, or SHU;

2.   Prohibiting all named defendants (excluding Reese, Brown, and Naugle) from having any further contact with plaintiff;

3.   Prohibiting all named defendants (excluding Reese, Brown, and Naugle) from participating in plaintiff's management plan;

4.   Prohibiting any CCCF employees that have engaged in any physical altercation or use of force with plaintiff from having any contact with plaintiff;

5.   Prohibiting all retaliatory conduct against plaintiff; and

6.   Prohibiting ODOC from moving plaintiff to a county jail or an out of state prison without plaintiff's permission.

## DISCUSSION

### A.   Likelihood of Success on the Merits

Plaintiff's first injunctive relief request, transfer to a non-triggering environment, would require ODOC to take affirmative, rather than preventative, action.   Therefore, it requests mandatory injunctive relief and subjects plaintiff's motion to a higher burden of proof.   She must show that the facts and law "clearly favor" her positions to obtain injunctive relief.   *Stanley*, 13 F.3d at 1320.   Plaintiff's argument on this point is relatively brief.[3]   She argues that the Eighth Amendment requires that prison officials (1) provide humane conditions of confinement; (2) ensure that inmates receive adequate food, clothing, shelter, and medical care; and (3) take reasonable measures to guarantee the safety of inmates. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).   Plaintiff argues that reasonable safety includes safety from sexual assault and freedom from retaliation for cooperating with law enforcement in the prosecution of an alleged abuser.   *See, e.g.*, *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005).

---

[3] Only plaintiff's second and third claims are relevant to the injunctive relief that she seeks.   The first claim is based on the alleged sexual abuse by defendant Gray, but the requested injunctive relief, and arguments accompanying that request, appear aimed at the harm caused by the allegedly retaliatory actions and plaintiff's current conditions of confinement.   Thus, only these claims are assessed in relation to the Motion for TRO.

Essentially, plaintiff argues that defendants are subjecting to her to a "serious risk of harm" in violation of the Eighth Amendment, and that defendants are retaliating against her in violation of the First Amendment. These claims are addressed in turn.

1.    *Conditions of Confinement Claim*

As stated by the Supreme Court, "[T]he Eighth Amendment prohibits punishments which, although not physically barbarous, 'involve the unnecessary and wanton infliction of pain,' or are grossly disproportionate to the severity of the crime[.]" *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (quoting *Gregg v. Georgia*, 428 U.S. 153, 171 (1976); citing *Coker v. Georgia*, 433 U.S. 584, 592 (1977)). A prisoner's Eighth Amendment claim requires a two-step inquiry: (1) whether the conduct itself was objectively unconstitutional; and (2) whether the offending actor's state of mind demonstrated "deliberate indifference." *Foster v. Runnels*, 554 F.3d 807, 812 (9th Cir. 2009).

Objectively unconstitutional conduct generally is that which deprives an inmate of the "minimal civilized measure of life's necessities." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991). Further, the inmate must demonstrate that the "conditions pos[e] a substantial risk of serious harm" or present an "excessive risk to [their] health or safety." *Farmer*, 511 U.S. at 834, 837. Certain conduct by prison officials has been identified as meeting this requirement. For example, "[s]exual harassment or abuse of an inmate by a corrections officer is a violation of the Eighth Amendment." *Wood v. Beauclair*, 692 F.3d 1041, 1046 (9th Cir. 2012). Serious medical needs may be grounds for an Eighth Amendment claim if the plaintiff demonstrates that "failure to treat [the] prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.3d 1050, 1059 (9th Cir. 1991) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

Though plaintiff's briefing on this point was concise, she provided more details at oral argument. Namely, she argues that her Eighth Amendment rights have been violated through: (1) deprivation of adequate mental health treatment; (2) unnecessary uses of force; (3) sexual harassment; and (4) the deprivation order requiring her to sleep on her cell floor. However, defendants argue that plaintiff's

living conditions, though restrictive, are constitutionally appropriate given her history of conduct. They flatly deny that plaintiff's mental health treatment is inadequate, and, as evidenced from the disputed facts, deny using unnecessary force.

        a.       Adequacy of Medical Treatment

To establish an Eighth Amendment claim against prison officials based on medical treatment, a plaintiff must first identify a "serious medical need" by demonstrating that "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle*, 429 U.S. at 104). Mental health needs are subject to the same standard as physical medical needs. *Disability Rights Mont., Inc. v. Batista*, 930 F.3d 1090, 1097 (9th Cir. 2019). It is undisputed that plaintiff's mental health diagnoses constitute a serious medical need. However, it is less clear that plaintiff has provided sufficient evidence of defendants' deliberate indifference.

Deliberate indifference may be evidenced through a "purposeful act or failure to respond to a prisoner's pain or possible medical need" that caused the plaintiff harm. *Id.* Further, indifference may be evidenced through denial, delay, or intentional interference with medical treatment. *Id.* However, not every difference of opinion regarding treatment is sufficient to establish deliberate indifference. *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004). Rather, deliberate indifference is shown only when a chosen course of treatment "was medically unacceptable under the circumstances," and was chosen "in conscious disregard of an excessive risk to [the prisoner's] health." *Id.* (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

In this case, plaintiff is receiving mental health treatment from CCCF. She is engaged in a behavioral intervention plan created and managed by two QMHPs and a psychiatrist. She participates in Dialectical Behavioral Therapy and has access to the Center for Hope & Safety for alternative treatment methods. Though plaintiff alleges that this treatment has "fallen well short of any positive measurable outcomes," is "a complete failure," and is "akin to victim blaming," plaintiff provides no non-anecdotal evidence undermining the efficacy or validity of the chosen course of treatment. Pl.'s Reply to Mot. for

TRO, ECF [23], at 5.  Acknowledging plaintiff's struggles with the treatment plan is not the equivalent of blaming her for those struggles; rather, it is an assessment of plaintiff's treatment progress.  On the record presently before the Court, these facts do not indicate that CCCF's treatment is "medically unacceptable" or akin to a "conscious disregard of an excessive risk to [plaintiff's] health."  *Toguchi*, 391 F.3d at 1058.  At best, plaintiff has identified a difference of opinion regarding the best course of treatment for her mental health conditions.

Though plaintiff makes general allegations regarding her physical medical treatment, the only identified incidents are those on December 3rd and December 19th.  As for the December 3rd incident, defendants have presented evidence indicating that plaintiff was not denied treatment, nor was treatment delayed.  On the contrary, defendants' evidence indicates that plaintiff received ongoing medical treatment and responses when she pushed her emergency button.[4]  As for the December 19th incident, plaintiff's allegations indicate that medical staff did respond to her allergic reaction.  Though she states that she "received no meaningful medical treatment," she provides no details regarding what treatment she received, aside from being denied medication.  J.B. Decl. ¶ 37.  On the record presently before the Court, plaintiff has not shown that the proven course of treatment was medically unacceptable for either incident.

Plaintiff has not shown that the facts and law clearly favor her position that her medical treatment is inadequate.

b.    Unnecessary Use of Force

It is not entirely clear what conduct plaintiff is alleging constituted an unnecessary use of force.  Regardless, "unnecessary use of force" is not the standard for an Eighth Amendment claim.  That is, as already stated, the Eighth Amendment is violated by punishment that is "grossly disproportionate to the severity of the crime warranting imprisonment."  *Gregg*, 428 U.S. at 171.  The Ninth Circuit has identified

---

[4] Though plaintiff presented a declaration by a purported expert opining that the care plaintiff received was inadequate, that opinion was based only on two voice recordings of plaintiff and plaintiff's own statements.  Decl. of Dr. Mark J. Baskerville, ECF [5], ¶¶ 4-6.  It relied on no medical records, no physical examination, or any other assessment tool. It is unclear how this opinion could assess the adequacy of plaintiff's medical treatment when it was formulated without reviewing what treatment plaintiff actually received.

five factors that bear on whether the use of force was objectively excessive and unnecessary: "(1) the extent of injury suffered by an inmate; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response." *Bearchild v. Cobban*, 947 F.3d 1130, 1141 (9th Cir. 2020) (quoting *Furnace v. Sullivan*, 705 F.3d 1021, 1028 (9th Cir. 2013)).

The primary allegations regarding force that the Court can discern from plaintiff's pleadings are the use of wrist restraints during a meeting with plaintiff's attorney and plaintiff's allegation that she was "dragged through the dayroom." Pl.'s Mot. 13-14. As for the first incident, assuming without deciding that the restraints were indeed placed on plaintiff too tightly, plaintiff has identified no case law supporting the proposition that the use of over-tightened handcuffs for an unspecified amount of time constitutes unnecessary force. Nor does plaintiff provide details regarding the length of time she was in the restraints or injuries she received, that could aid this Court's analysis. As for the second incident, defendants presented conflicting evidence. Defendants allege that, once inside plaintiff's cell, she was given multiple opportunities to voluntarily submit to restraints but refused to do so. They further allege that they used "minimal force" to gain control and used multiple de-escalation tactics prior to their use of force.

Plaintiff has not shown that the facts and law clearly favor her position that she has been subjected to unnecessary uses of force.

c.    Sexual Harassment

First, plaintiff alleges that she was "sexually harassed by defendant Kizer" shortly after Gray's alleged abuse happened. Pl.'s Mot. 8. Plaintiff alleges that she filed a grievance, but that Kizer continues to work in her unit.

Plaintiff cites *Farmer v. Brennan*, 511 U.S. 825, and *Wood v. Beauclair*, 692 F.3d 1041, for the proposition that a correctional officer's sexual harassment of an inmate is an Eighth Amendment violation. However, these cases involved incidents where the sexual harassment or abuse was conducted physically, not solely through oral communication. This is likely because the Ninth Circuit has "consistently placed prisoner sexual assault claims within the same legal framework as excessive force

13

claims." *Bearchild*, 947 F.3d at 1140. Plaintiff has provided no facts describing the nature or form of Kizer's alleged harassment. In the absence of specificity, this Court cannot determine whether the conduct is likely to meet the objective standard of an Eighth Amendment violation without resorting to speculation. That is, plaintiff's allegations provide little basis for determining that Kizer's alleged conduct resulted "in the gratuitous infliction of suffering." *Wood*, 692 F.3d at 1050-51.

Second, plaintiff alleges that she was sexually harassed by another AIC, who made loud statements about plaintiff and Gray for weeks during November of 2023. This allegation implicates defendants' responsibilities to ensure plaintiff's reasonable safety. In this context, plaintiff must show that the AIC's conduct posed an excessive risk to her safety, that defendants knew of that risk or could have inferred that the risk existed, and that defendants failed to ensure plaintiff's reasonable safety. *Farmer*, 511 U.S. at 841-44. Assuming, without deciding, that the AIC's conduct posed an excessive risk to plaintiff, the evidence indicates that defendants were aware of the risk. However, prison officials who respond reasonably to a substantial risk to an inmate's safety may still escape liability, "even if the harm ultimately [is] not averted." *Id.* at 844. Defendants took steps to ensure plaintiff's safety by removing the other AIC from plaintiff's housing unit. Further, plaintiff has been given opportunities to transfer to a different housing unit but refused to do so. Wilson Decl. ¶¶ 20-21. In the given circumstances, the Court cannot say that defendants' conduct has been unreasonable. Thus, plaintiff has not shown that the facts and law clearly favor her position that defendants have failed to ensure her safety.

       d.     Conditions of Confinement

Finally, plaintiff alleges that the deprivation order following the December 20th incident imposed unconstitutional conditions of confinement. Plaintiff cites no case law for the proposition that sleeping without a mattress for three nights rises to the level of an Eighth Amendment violation. Ninth Circuit precedent on the issue provides no bright-line rule, though the court has stated that deprivation of a prisoner's mattress for one night is "insufficient to state an [E]ighth [A]mendment violation." *Hernandez v. Denton*, 861 F.2d 1421, 1424 (9th Cir. 1988), *vacated on other grounds*, 493 U.S. 801 (1989). Further, in *Schroeder v. Kaplan*, the Ninth Circuit determined that the plaintiff had no clearly established right under

the Eighth Amendment to be provided with a mattress. No. 93-17123, 1995 WL 398878, at *2 (9th Cir. July 7, 1995). In finding that such a right was not clearly established, the court looked to cases from other circuits and determined that those cases focused primarily on the conditions that accompanied the mattress deprivation to determine whether an Eighth Amendment violation existed. *Id.* Here, the accompanying circumstances indicate that plaintiff's deprivation order did not rise to the level of cruel and unusual punishment. Viewing the totality of plaintiff's allegations, she has not shown that the facts and law clearly favor her position that she was subjected to unconstitutional conditions of confinement.

       2.     *First Amendment Retaliation Claim*

       Generally, First Amendment retaliation claims by prisoners require that a plaintiff show five elements: (1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of their First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal. *Rhodes*, 408 F.3d at 567-68.

       In essence, plaintiff argues that Yonally, Leak, and Arrington are retaliating against her for cooperating in Gray's investigation, and for continuing to file grievances related to the officers' conduct. Plaintiff's motion does not consistently specify which allegations, in particular, she believes to be retaliatory; however, as best the Court can tell, plaintiff alleges that the June 6th incident with Leak, when he wrote plaintiff a DRV during her meeting with Gonzales, was retaliatory. She alleges that defendant Arrington retaliated against her by wrongfully denying a grievance that she filed against defendant Brown. She alleges that officers are retaliating by refusing to respond to her when she presses her emergency button, or by responding but refusing to allow her to see BHS. She alleges that officers have made her meetings with her lawyers difficult by "unreasonably refusing to allow [her] to bring items to their meetings." Pl.'s Mot. 12. She alleges that officers are retaliating by failing to respond to her medical emergencies, namely the December 3rd incident and the December 19th incident. Finally, she alleges that the December 20th cell extraction and resulting deprivation order were retaliatory.

       a.     DRV

Plaintiff argues that the June 6th DRV was "bogus" and used only as a retaliatory measure. However, there is conflicting evidence regarding the legitimacy of the DRV. Though plaintiff alleges that the DRV was dismissed by the hearings officer because it was contradicted by video evidence, defendants allege that it was dismissed "in the interest of not further escalating [p]laintiff's behavior." J.B.'s Decl. ¶ 21; Leak Decl. ¶ 17. Further, defendants have submitted evidence indicating that plaintiff has received numerous disciplinary violations since entering CCCF. Between May 17, 2022, and February 19, 2023, prior to plaintiff meeting defendant Gray, plaintiff received eleven misconduct reports. Wilson Decl. ¶ 25. From June 26, 2023 to November 1, 2023, after Gray's alleged abuse came to light, plaintiff received six misconduct reports.[5] *Id.* In each timeframe, the bases for the violations were similar: they were frequently based on Disrespect, Disobedience of an Order, and Staff Assault. *Id.* Further, defendants argue that even though plaintiff "yells profanities, insults staff with derogatory language, and verbally threatens to physically assault staff on an almost daily basis," she is not written a misconduct report for "every incident" but rather, staff attempt to "redirect and deescalate plaintiff." Wilson Decl. ¶ 29.

Though plaintiff need not provide direct evidence of retaliatory intent, the causal element of a retaliation claim still requires, at the very least, "a chronology of events from which retaliation can be inferred." *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2014). On balance, the chronology of events undermines the inference that the June 6th DRV was issued in retaliation for plaintiff's cooperation in Gray's criminal investigation. The disputed evidence about why the DRV was dismissed further weakens the inference. Therefore, plaintiff has not shown that the facts and law clearly favor her position that Yonally and Leak are using DRVs to retaliate against plaintiff.

      b.      Grievances

Plaintiff alleges that defendant Arrington wrongfully denied her grievance against Brown; however, plaintiff provides no evidence of the basis of the denial. The mere assertion that the denial was unwarranted is likely insufficient to establish that it was denied for a retaliatory motive, or that Arrington

---

[5] In December 2023, plaintiff received seven additional DRVs that have been adjudicated by a hearings officer, but are currently awaiting Brown's final review.

lacked a legitimate correctional goal for denying the grievance. Therefore, plaintiff has not shown that the facts and law clearly favor her position that Arrington is denying her grievances to retaliate against plaintiff.

        c.       Emergency Button

        Plaintiff alleges that the defendant officers are retaliating against her by failing to respond to her emergency button, or refusing to allow her to see BHS when she presses the button. Plaintiff provides no evidence of the dates or times that this allegedly occurred, making it difficult for the Court to assess the chronology of events. Further, defendant Yonally stated in a declaration that, "Staff are not always able to drop everything and accommodate JB's demands instantly. For example, there may be another AIC being escorted when JB makes a request or presses the emergency button, and staff are not going to terminate such a movement and stop that operation to accommodate JB more quickly." Yonally Decl. ¶ 27. Similarly, defendant Leak states, "We respond to [plaintiff's] repeated emergency button pushes even when there is no emergency." Leak Decl. ¶ 34. The lack of specificity in plaintiff's allegations on this point, and defendants' arguments that legitimate correctional goals are advanced when plaintiff's button is not responded to immediately, undermine the merits of plaintiff's claim. Plaintiff has not shown that the facts and law clearly favor her position that defendants are failing to respond to her emergency button to retaliate against her.

        d.       Attorney Meetings

        Plaintiff alleges that CCCF staff have made her meetings with her attorneys more difficult. This allegation is based on one of plaintiff's attorney's declaration, which details three separate incidents: (1) On December 5, 2023, plaintiff's phone call appointment with her attorney was scheduled at the same time that she had signed up to use a tablet and phone to speak with her mother, but plaintiff was not informed of the scheduling conflict until the meeting time; (2) on December 8, 2023, plaintiff was not allowed to obtain her legal paperwork from her cell prior to an attorney meeting, officers had her attorney go to plaintiff's cell to look for the paperwork, and officers refused to take plaintiff to look for the paperwork when she "expressed her frustration that so much time had been wasted"; (3) on November 28, 2023, officers asked plaintiff's attorney if it was okay if plaintiff brought a book and radio into the meeting and

refused to allow plaintiff to bring water to the meeting. Decl. of Megan Apshaga, ECF [4], ¶¶ 22-29. In none of these alleged incidents are the involved correctional officer(s) identified as a named defendant.

Regardless, defendants refute this allegation, providing evidence that plaintiff's attorneys have access to CCCF upon request but that, "as with all visitors [they] must still be subject to reasonable restrictions in recognition of the facility's legitimate security requirements" and that this is "particularly true for visits to a highly controlled area such as BHU." Wilson Decl. ¶ 42. Defendants also allege that plaintiff has expanded access to phone calls with her attorneys, and that such access has been "facilitated beyond the requirements of rule and without requiring the call to be initiated by the attorney as prescribed in the rule." Defs.' Resp. 10.

As for the November 28th incident, plaintiff has not alleged facts indicating that preventing plaintiff from bringing a radio and book to her meeting did not advance a legitimate correctional goal. As defendants' evidence indicates, the BHU is a highly controlled environment because AICs placed in the BHU have "serious management concerns." Wilson Decl. ¶ 11. Defendants' evidence further indicates that on October 12, 2023, plaintiff used broken pieces from a radio that she had destroyed to self-harm. Yonally Decl. ¶ 22. Additionally, plaintiff provides no context for the allegation that she was not permitted to bring water to the meeting, or why this was a necessary item for her meeting.

As for the December 5th incident, plaintiff similarly has not alleged facts indicating that preventing plaintiff from calling her mother in lieu of her attorney meeting did not advance a legitimate correctional goal. To be sure, the scheduling conflict was unfortunate; however, plaintiff's allegations indicate only that the officer had to choose between plaintiff missing an appointment with her attorney or missing a phone call with her mother. On these facts, it does not appear that the officer's decision did not advance a legitimate correctional goal.

Finally, plaintiff has not alleged facts indicating that the December 8th incident did not advance legitimate correctional goals. The facts do not indicate that plaintiff requested that she be able to bring the paperwork or that the officers had reason to know plaintiff needed paperwork for the meeting when she was first brought from her cell. Nor do the facts indicate that the officers lacked legitimate reasons

for expeditiously bringing plaintiff to her meeting; as indicated by defendants' evidence, plaintiff appears to struggle with transport procedures. *See* Yonally Decl. ¶ 13 ("It is not uncommon for JB to assault staff and slip her wrist restraints in order to assault staff."); Wilson Decl. ¶ 25 (describing three incidents where plaintiff refused to submit to restraints or used her restraints to injure an officer). Additionally, plaintiff has not shown that making her attorney look for the paperwork did not advance a legitimate correctional goal, given that it was likely more efficient than transporting plaintiff back and forth.

On balance, none of these incidents show that the facts and law clearly favor plaintiff's position that defendants are hindering her ability to meet with attorneys to retaliate against her.

### e.    Medical Emergencies

Plaintiff alleges that officers are retaliating against her by failing to respond to her medical emergencies, namely the December 3rd and December 19th incidents. As for the December 3rd incident, as already discussed, defendants provided substantial evidence that plaintiff received extensive medical treatment during this incident. As for the December 19th incident, plaintiff states that "a nurse came to see me, but the on-call provider refused to provide any type of medication for me." J.B. Decl. ¶ 37. This does not support plaintiff's allegation that her medical situation was ignored. Plaintiff provides no timeline regarding the length of time it took for medical staff to arrive, or when medical staff were contacted. Nor does she provide context for how similar situations, if any, were handled prior to her cooperation in Gray's criminal investigation. On the record presently before the Court, the evidence does not support a finding that officers wholly ignored plaintiff's medical problem or that their response differed from any prior conduct. Therefore, plaintiff has not shown that the facts and law clearly favor her position that officers are ignoring her medical emergencies to retaliate against her.

### f.    Cell Extraction & Deprivation Order

Finally, plaintiff alleges that the December 20th cell extraction and deprivation order were retaliatory measures. Again, plaintiff has not alleged facts indicating the absence of a legitimate correctional goal for the cell extraction or deprivation order. Defendants have presented evidence that plaintiff's action of placing the mattress against her cell door caused "extreme concern since security staff

cannot see inside the cell and determine if the AIC is safe or has engaged in any self-harm." Yonally Decl. ¶ 17; *see* Wilson Decl. ¶ 37 ("[U]sing a mattress to cover the cell window and block the door poses a serious security threat to both the AIC and staff. This is particularly true [ ] given [p]laintiff's history of self-harm."). Though plaintiff provides little context for why she was brought to the shower after the cell extraction, defendants explained that plaintiff had "covered herself and the floor in a slick substance, similar to soapy water" and the shower provided her with an "opportunity to wash the substance off and a period to calm down." Yonally Decl. ¶ 18. On the record presently before the Court, plaintiff has not provided sufficient evidence that defendants lacked a legitimate correctional goal for the cell extraction or for taking plaintiff to the shower after extraction.

Similarly, defendants have provided evidence of legitimate correctional goals that were advanced through the deprivation order. As stated by defendant Yonally, "When an AIC uses an item, service, or activity to damage property, obstruct security, or threaten physical violence to self or others[,] that item, service, or activity may be temporarily removed by order of the Officer in Charge or designee." *Id.* ¶ 21. Thus, because plaintiff had placed her mattress against her door in a manner that prevented staff from conducting wellness checks, her "bedding was removed from the cell until [plaintiff] would demonstrate a baseline level of compliance with staff instructions and refrain from threats to staff and/or blocking the view of her cell." *Id.* Plaintiff has not shown that the facts and law clearly favor her position that the December 20, 2023 cell extraction or deprivation order were retaliatory measures.

## B.      Remaining *Winter* Factors

Because plaintiff has failed to meet the threshold inquiry that the facts and law clearly favor her positions, this Court need not consider the other preliminary injunction factors. *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018). Plaintiff has not established that she is entitled to the "extraordinary remedy" of a preliminary injunction.

## C.      All Writs Act

Alternatively, plaintiff requests an Order of Protection under the All Writs Act, 28 U.S.C. § 1651. The All Writs Act permits federal courts to "issue all writs necessary or appropriate in aid of their

respective jurisdictions and agreeable to the usages and principles of law." *Id.*   However, such relief is warranted only when "the legal rights at issue are indisputably clear."  *Makekau v. State*, 943 F.3d 1200, 1204 (9th Cir. 2019) (quoting *Hobby Lobby Stores, Inc. v. Sebelius*, 568 U.S. 1401, 1403 (2012)).  Plaintiff argues that it is "unreasonable to expect [p]laintiff to peacefully co-exist with the named [d]efendants" and that, in the absence of an order, CCCF staff "will be left with every incentive and no deterrent to thwart litigation that is critical of CCCF's practices."  Pl.'s Mot. 6-7, 17-18.

However, defendants argue that there is no need for aid of this Court's existing jurisdiction. *Doe #1 v. Trump*, 458 F. Supp. 3d 1220, 1223 (D. Or. 2020) (emphasizing that All Writs Act may only be used in aid of *existing* jurisdiction).  Further, defendants highlight *Schiavo ex rel. Schindler v. Schiavo*, an 11th Circuit case that indicates a district court should not issue relief under the All Writs Act when adequate relief is available through a preliminary injunction. 403 F.3d 1223, 1229 (11th Cir. 2005).

Based on the record presently before the Court, this "extraordinary remedy" is neither necessary nor appropriate to aid this Court's jurisdiction.  Therefore, the Court declines to issue an Order of Protection under the All Writs Act.

## CONCLUSION

Accordingly, plaintiff's Motion for Temporary Restraining Order, ECF [2], is DENIED.

IT IS SO ORDERED.

DATED this 29th day of January, 2024.

Adrienne Nelson
United States District Judge